Hunt, J.,
delivered the opinion of the court:
The claimant held the office and performed the duties of collector at the port of Suspension Bridge, N. Y., from March 5, 1870, to January 25,1878. His petition asks for judgment for the sum of $14,535.23. This sum is claimed as compensation for his official services due to him under the acts of Congress regulating such compensation. He alleges that section 5 of the act of March 3,1841, provides that “ every collector of customs * * * shall render a quarter-yearly account under oath to the Secretary of the Treasury *' * * of all sums of money * ' * * received or collected for rent and storage * * * or for custody of goods in bonded warehouses; and if from such accounting it shall appear that the money received in any one year by the collector * * * on account and for rent and *390 storage and for fees and emolument shall in the aggregate exceed the sum of two thousand dollars, such excess shall be paid by the collector * * * into the Treasury as public money.”
The manifest purpose of this provision was to award to every collector $2,000 per annum as compensation when the moneys thus received equaled or exceeded that stun.
Section 40 of the act of July 18, 1866, provides further “that all moneys received by collectors for the custody of goods, wares, and merchandise in bonded warehouses shall be accounted for as storage under the provisions of the fifth section of the act of March 3,1841.” This act was intended to be merely explanatory of the existing law. It leaves no doubt that all receipts from the sources mentioned were subject to the provisions of the act of 1841 and to the collector’s rights there established.
The claimant proceeds to state that from the time he became collector of the port of Suspension Bridge up to the 15th June, 1877, there have been constantly employed at that port certain insi>ectors of the customs, who have had charge of the depots of the Hew York Central Bailroad Company, portions of which were established as a bonded Avarehouse, and Avho had custody of the goods, Avares, and merchandise stored in it; that the claimant has received, in his official character of collector, from the NeAv York Central Bailroad Company, and from the Great Western Bailroad Company of Canada, or their agents, certain sums of money, paid to him as collector of customs to reimburse the United States for the salaries of such inspectors ; that the Great Western Bailroad Company have enjoyed the benefit of the use of the employment of these inspectors jointly with the NeAv York Central Bailroad Company, and under an agreement between themselves; that the sums thus paid in each year, from the year ending June 30,1871, up to and inclusive of the year ending June 30, 1877, have exceeded the sum of $2,000 annually; that in accounting to the Treasury Department from time to time he has placed the sums so received to the credit of the government, under the head of “ Services of United States officers,” and has thus accounted for them erroneously, AAhereas he should have accounted for them under the head of storage, as provided by the fortieth section of the act of July 15,1866, and by the fifth section of the act of March 3,1841, already cited.
*391 The petitioner claims that he is entitled to recover back the moneys thus accounted for, amounting to $14,535.23. This sum is arrived at by deducting the compensation actually received by him from all sources in each year from the maximum annual compensation to which he is limited by law, $4,500; the difference in each year, if covered by the receipts from storage in that year, and not exceeding $2,000, representing the balance to which he is entitled for such year, and by adding the balance for all the years from the fraction of the year ending June 30, 1870, up to and inclusive of the year ending June 30, 1877.
The allegations of fact which the petitioner sets forth are fully substantiated by the findings of the court on file.
The questions of law presented for consideration have been definitely determined by the Supreme Court, by this court, by the opinions of the Attorney-General; and by the practical interpretation at present given to the subject by the Treasury Department.
In commenting upon the sections of the statutes already quoted, in a case identical with that now before us, the Supreme Court said:
!l Regulations provide that all moneys received by collectors from owners or occupants of private bonded stores in payment for half-storage, or for the attendance of an inspector at the premises, will be accounted for as receipts for storage in their accounts with the department. Evidence is not wanting to show that the department has constantly recognized the subsisting operations of the provisions under consideration in relation to storage. Throughout the period since its passage, the department lias required collectors to include the sums received from storage in their quarterly accounts, and if the provision is in force for that purpose, it is difficult to see why it is not also in force as authorizing the allowance to collectors.”
And the court proceed to decide that—
“ Sums received for storage not exceeding two thousand dollars in any one year, if duly included in their quarterly accounts, are as much due to the collectors of the non-enumerated ports as to the incumbents of the larger offices, and their right to the same rests on the same foundation.” (United States v. McDonald, 5 Wall., 659; 6 C. Cls. R., 31; Ops. Attys. Gen., 37; Id., 313.)
These authorities would seem decisive of this controversy; but the learned counsel for the government has presented in his brief and oral argument several objections to their applica *392 bility, wMcli, although they do not command our concurrence, are nevertheless worthy of consideration.
It is urged that the warehouse described in the findings of the court was not a bonded warehouse within the meaning of the statute. The bond given by the railroad company, it is said, does not in all respects comply with the requirements of the statute. The language of the bond is that the company “ shall indemnify'the Government of the United States of America, the collector of the port, * * * aud any other officer and officers of the customs of said port” against any claim, &c., for the loss of,- or any decay, waste, or damage that may happen to, any goods, wares, or merchandise that now are or hereafter may be stored under the warehouse acts of the 6th of August, 1846, and 28th of March, 1854, and Treasury regulations under said acts in the depots or premises at or near either terminus of said road and in the cars whilst in transit over or at stations along the line of said road, natural decay or undavoidable waste, &c., excepted.”
We think these terms are a substantial compliance with the ’statute. The language of the act of 28th March, 1854, is that the party “ shall enter into bond, in such sums and with such sureties as may be approved by the Secretary of the Treasury, exonerating and holding harmless the United States and its officers from or on account of any risk, loss, or expense of any kind or description connected with or arising from the deposit or keeping of the merchandise.” (Rev. Stat., § 2961.) The words of the bond, “ shall indemnify the government, &c., for the loss of, or any decay, waste, or damage that may happen,” &c., are both apt and ample to afford the government and its officers the very protection and security contemplated b3 the statute. The words of the bond and the words of the statute are not identical, but to all intents and purposes they are tantamount to one another. The sureties on such a bond would be as much bound and in the same manner by the use of either set of phrases.
The bond purports expressly to be given for goods stored “under the warehouse .acts of 6th August, 1S46, and 28th March, 1854, and Treasury regulations under said acts.” A copy of it was transmitted to the department and is now on file there. The warehouse was entered in the “ Register of Ware *393 houses, Customs,” oil the list of bonded warehouses of record in the department.
It is true, as the counsel for the defendants urges, that this bond is for a double purpose: of the nature of a bond for warehousing and of a bond for carrying dutiable goods. But if it be good and valid as a warehouse bond, we are unable to perceive how its force and effect can be vitiated or even weakened by its being also good for any other lawful purpose besides.
The department is shown to have called and considered the warehouse “ a bonded warehouse.” In June, 1877, it ordered the discontinuance of the use of the premises as “ a bonded warehouse”; and subsequently it re-established them as such. They are still used and regarded as a bonded warehouse; they are constructed and secured in the manner required by law, and the government holds the keys to their doors.
The defendants next contend that the claimant cannot recover because his accounts have been duly rendered, audited, and settled, and cannot rightfully be opened and readjusted; and that even if they could be opened, the claim is for money voluntarily paid over by claimant to the government without protest, and it cannot be recovered back. •
The first inquiry suggested by this objection is whether the sums in dispute have been voluntarily paid over by the claimant. The facts, as shown by the findings, are that the claimant, upon being appointed collector and on taking possession of his office, was at once confronted with an order from the Treasury Department, addressed to his predecessor, in the following terms:
“Treasury Department,
“ OPEICE OE COMMISSIONER OE CUSTOMS,
“Dee. 21,1866.
“You will please deposit the sum of $615, collected by you for services of U. S. officers, & also all pi’evious sums received for a like purpose. You will also bear in mind that all moneys, of every description, not received by you by warrant on the Treasury, must be deposited, as [they] will be credited in your account.
“ Very resp’y, «fee.,
“N. SARGENT, Comm'r.
“To Franklin Spalding, Esq.,

uOoWr of Gmtoms, Nist. of Niagara,

“ Suspension Bridge, N. Y.”
*394 It is impossible to read this peremptory admonition without noting the threat that underlies its imperative command. You will also hear in mind” that all moneys must he actually deposited.” It is too plain for argument that payment made by a subordinate under such an order can by no strain of interpretation be deemed voluntary. We can but repeat the doctrine recently laid down by the Chief Justice in the case of Ilance Lawson v. The United States, before this court: “It was demanded of him by his official superior, as now appears, without warrant of law, and it would be a reproach to the government to hold it unlawfully, merely because he submitted, without protest, to an order which he was not legally bound to resist; and resistance to which might not only have cost him his office, but involved him in expensive and injurious conflict with the government.”
There is nothing in the argument that the order in this case was addressed to Franklin Spalding, esq., collector, &e., and was therefore not binding upon the claimant. It was an order to the officer and not the individual. It was a rule to govern the official conduct of every collector who might hold the office after its promulgation. It seems to have been warranted by the statute of Congress on the subject. The section (3617 Eev. Stat.) declares: “The gross amount of all moneys received, from whatever source, for the use of the United States, except as otherwise provided in the next section, shall be paid by the officer or agent receiving the same into the Treasury at as early a day' as practicable, without any abatement or deduction on account of salary, fees, costs, charges, expenses, or claim of any description whatever.”
The next inquiry for our consideration is whether the claimant is precluded by the several settlements of accounts between the department and himself from now urging his demand. The fact is found by the court that the claimant made no objection to the manner of rendering his accounts or of settling them, and suggested no different manner of doing so till February 12, 1877.
The general rule at common law in this country and in England, that money paid in mistake of law cannot be recovered back, when all the facts are known to the parties and there is no fraud, lias been found to be too broadly stated to meet the demands of justice in determining the rights of individuals in *395 all cases. It is founded on the maxim of the civil law, Ignoran-tía legis neminem excusat. It is a x>rinciple of universal application in the administration of criminal jurisprudence; but, in the language of Judge Richardson in the case of McKee v. The United States, “ when made the foundation of a rule that money paid in mistake of law can in no case be recovered back unless fraud is proved, its application seems to be extended far beyond justification.” (12 C. Cls. R., 551.)
It is i>roper here to add that the civil law most unequivocally qualified the general rule by admitting many exceptions to it, and that its misapplication in the common law has in most instances arisen from a disregard of these qualifications. It is a familiar principle of that system, applicable to this case, “ Juris ignorantia non prodest aegidrere volentibus, suum vero petentibths non meet.” (Dig., lib. xxii, tit. vi, 1. 7; 2 Evans Pothier on Ob., 393.)
Whilst by that system a contract formed for the purpose of avoiding litigation cannot be rescinded for error of law, it is equally true that such error can never be alleged as a means of acquiring. An error of law may be invoked as a means of preventing a loss or of recovering what has been paid under such error.
In the case of Hance Lawson, already cited, the court had occasion to examine and interpret the application of this rule to a condition of facts similar to the features presented in this record. We there held, “that where, under the authoritative requirement of the Treasury Department, the claimant had paid balances into the Treasury without protest, that fact gives no right to the government to hold the money. It was not in the eye of the law a voluntary payment.” (See De Bow v. United States, 11 C. Cls. R., 079; 13 id., 526.)
The statute of limitations is invoked by the government against the claimant’s demand. His petition was filed in this court on 20th October, 1877. A portion of the claim is barred. In the case of Bachelor v. The United States, this court held that in a case like the present the statute begins to run from the end of each fiscal year, and cuts off all compensation not falling due within six years before the institution of the suit. (8 O. Cls. R., 239.) His claim must therefore be reduced, according to the findings, to the sum of $11,954.73.
It is therefore ordered, adjudged, and decreed that the claimant do have and recover the said sum of $11,954.73.